## LARSON v. INDUSTRIAL COMMISSION et al.

No. 5140.   Decided November 30, 1932.   (16 P. [2d] 219.)

*A. B. Irvine* and *Geo. A. Udall,* both of Salt Lake City, for plaintiff.

*Geo. P. Parker,* Attorney General, and *M. Logan Rich,* Deputy Attorney General, for defendants.

### EPHRAIM HANSON, J.

Matilda Larson made an application to the Industrial Commission for compensation for the death of her son, Oscar E. Larson.  A hearing was had before the commission and compensation denied.  The commission found Mr. Larson was not in the employment of the defendant mining company at the time of the accident resulting in Mr. Larson's death.  Mrs. Larson has brought the cause here for review.  She seeks to have the order denying compensation annulled.  For cause therefor she asserts that the evidence received before the commission was such as required the commission, as a matter of law, to grant her compensation. It is made to appear that the Chief Consolidated Mining Company was, at the time complained of, the owner and operator of the Grand Central Mining Company.  The Chief Consolidated Mining Company was at the time in question

an employer of labor subject to the Industrial Act of this state (Comp. Laws 1917, § 3061 et seq., as amended). It carried insurance with the state insurance fund. The commission found that Mrs. Larson was partly dependent upon her son Oscar at the time he was fatally injured. No complaint is made of that finding. The only question before the commission was whether or not Oscar E. Larson was an employee of the defendant mining company within the meaning of the Industrial Act at the time of the fatal accident. The material facts are not in dispute. On April 1, 1930, the defendant Chief Consolidated Mining Company entered into a written lease with Oscar E. Larson. The lease, by its terms, expired on June 30, 1930, at noon on that day. The lease contained, among others, these provisions:

"No oral lease whatever is authorized or good. * * * It is mutually agreed by and between the Company and the Lessees that any and all modifications or alterations of or additions to or changes in any of the terms, conditions, provisions or agreements in this lease contained, hereafter at any time claimed by either party to have been made orally or otherwise than in writing signed by the parties under due authority therefor, shall be void and not binding on either party hereto."

The part of the mine leased by Mr. Larson is described as "Shaft No. 5 Block D-201 from the 1800 foot level to the 2000 foot level." For some months prior to the execution of the lease above referred to, other leases of a similar character had been given to Mr. Larson, who had complied with the terms thereof to the satisfaction of the company. Mr. Larson and one Lester Ostler worked under the lease dated April 1st until about the middle of April, 1930, when they ceased operating under the lease. Mr. Larson went to work for wages in the Eureka Lily mine which was owned by the defendant mining company. He continued in that employment until August of that year. On August 8, 1930, Mr. Larson went to the mine in which he had theretofore been leasing. He was accompanied by one G. W. Manson. They were given permission to and did enter the mine on

that day. Before entering the mine, each signed an application for permission to inspect the mine. Each of the applications so signed by Mr. Larson and Mr. Manson reads as follows:

"Chief Consolidated Mining Co.

"I am desirous of inspecting your mine with the view of determining whether I care to make a proposition to lease any portion thereof, and I appreciate the fact that the same may be in an unsafe and dangerous condition. However, if you will give me the privilege of going into your mine for this purpose, I agree not to hold you liable for any personal injuries, or death, that may happen to me while in your mine or on the property of your company, no matter from what cause; nor will I make any claim of any right to or interest in any block of ground or any ores that may be found in the course of any exploration work I may do, unless you shall give to me and I shall sign one of your standard forms of underground leases covering same, and then, only, such rights and interests as are secured to me by such lease; and no verbal promise made to me by any underground foreman, lease foreman, or other representative of yours, shall bind you or give to me any rights, claims or demands against you, it being understood by me that your standard form of lease, if and when executed and delivered by you to me, is the only thing that is or shall be binding on you with reference to any situation that may arise, and of the exercise of the privilege granted to me hereby. If I do my exploratory work while exercising the privilege hereby given to me, I will do same personally and without assistance from any associates or employees. You reserve and are given the right to revoke the privilege and license hereby given to me at any time."

On August 11, 1930, Mr. Larson again entered the mine. At that time he was in company with one C. C. Firth, who, before entering the mine, signed an application to inspect the mine. Mr. Larson and Mr. Firth procured a rope and proceeded to the 1,800-foot level and to that part of the mine which was covered by the lease between Larson and the defendant mining company under date of April 1, 1930. It appears that, while Mr. Larson was leasing from the defendant mining company, he worked on a raise which extended from the 2,000 foot level up to the 1,800 foot level.

At the time he ceased working under the lease he had nearly run out of ore, and desired to find a new place to work. There was in this vicinity a shaft or winze extending from the 1,800-foot level down to the 2,000 foot level. There was a blind drift leading off from this shaft or winze at a point about 60 feet below the 1,800-foot level. Mr. Larson and Mr. Firth desired to inspect the blind drift to ascertain whether it would be profitable to lease in the drift. The drift had not been worked for a number of years, and a bulkhead had been constructed over the top of the shaft or winze at the 1,800-foot level. Mr. Larson and Mr. Firth removed the bulkhead. They then tied a rope to a pipe at the top of the shaft or winze. While Mr. Larson was descending on the rope to the blind drift, he lost his hold on the rope, fell to the bottom of the shaft or winze, and was instantly killed.

The plaintiff claims that Mr. Larson, in entering the mine and in attempting to reach the blind drift, did so by virtue of the lease between him and the defendant mining company dated April 1, 1930. Plaintiff also claims that Mr. Larson, as the lessee of the defendant mining company, was at the time of the accident under the protection of the Industrial Act, particularly the provisions of Comp. Laws 1917, § 3111, as amended by Laws 1919, c. 63, p. 157, so as to provide:

"All lessees in mines or of mining property, and the employees and contractors of all such lessees who are engaged in the performance of work which is a part or process in the business that is being actually conducted by the lessor, and over whose work the lessor retains supervision or control, shall be deemed, within the meaning of this Section, employees of such lessor drawing such wages as are paid employees for similar work; provided, that the lessor may deduct from the proceeds of ores mined by the lessees the premium required to be paid."

In support of her claims, the plaintiff produced evidence showing that, when Mr. Larson ceased working on the lease, he left his tools in that part of the mine where he had been

operating under the lease; that Mr. Coombe, the foreman of the mine, promised Mr. Larson at the time he quit operations under the lease that he could have his old lease when he came back. The plaintiff's husband and her counsel each testified that after the accident they had a conversation with Mr. Coombe, and that in such conversation Mr. Coombe had said:

"That Oscar (decedent) quit working on the lease * * * because the company wanted him to go over to the Lily for awhile, and also because the ore had somewhat pinched out on the lead and it was not paying so well as it should and Oscar needed the money * * * That Oscar agreed that he would come back and continue his lease on the 20 and 18 and sink instead of raise. * * * I knew Oscar was coming back * * * so I kept it (the lease) for him."

J. Fred Johnson, the superintendent of the defendant mining company, testified that the mining company required all contracts of lease to be in writing; that the rules of the company did not permit a lessee to continue to work under a lease after the date of its expiration. John Coombe, the foreman of the defendant mining company, made a written statement of what occurred on the day that Mr. Larson first entered the mine and on the day of the accident which resulted in Larson's death. The statement was admitted in evidence pursuant to a stipulation of the parties. The statement so made is to the effect that Mr. Larson entered the mine on the day in question in search of a place to lease, and not pursuant to the lease between him and the company which was dated April 1, 1930, and which expired on June 30, 1930. The commission found that the decedent was not an employee of either mining company at the time of the accident, and denied compensation to the applicant. There is no substantial evidence to show that at the time of the accident any relation of employer and employee or lessor and lessee existed between the decedent and either of the mining companies. The lease executed April 1, 1930, between the Chief Consolidated Mining Company and the deceased expired June 30, 1930. No substantial evidence

was produced to show that the period or life of the lease had been extended. Before it expired, the decedent ceased to operate under it, and went to work elsewhere in the Eureka Lily mine owned by the Chief Consolidated Mining Company until August 8, 1930. Whatever relation theretofore existed between him and the mining company then ended. There was none by virtue of the lease, for that expired June 30, 1930. When he thus, on the fatal day, entered the mine wherein he theretofore had the lease, he did so, not in pursuance of the lease or any kind of employment, but in pursuance of his signed application hereinbefore set out for the purpose therein stated, to inspect the mine "with the view to determine whether" he "cared to make a proposition" to lease any portion thereof. Such signed application dispels any claim of an existing or continuing relation of employer and employee or lessor and lessee. In view of the record, the finding and conclusion of the commission is clearly justified, and the same is hereby affirmed.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.